IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JARED COCKROFT,

                  Plaintiff,

          v.

TIMOTHY MOORE, individually and
in his official capacity as Sheriff of Polk
County, Wisconsin,

                  Defendant.

OPINION AND ORDER

08-cv-402-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Jared Crockroft, a deputy sheriff for Polk County, worked vigorously but unsuccessfully for the defeat of his boss, defendant Sheriff Timothy Moore, when Moore ran for re-election in 2006, and after the election, found himself reassigned from one form of patrol duty to another and relieved of his responsibilities as a firearms instructor. Believing that defendant took these actions in retaliation for his political speech, plaintiff sued for monetary and injunctive relief under 42 U.S.C. § 1983, contending that defendant had violated his First Amendment right to speak out in behalf of opposition candidates and had created workplace conditions amounting to constructive discharge without providing due process.

1

Defendant has moved for summary judgment on a number of grounds. It is not necessary to address all of them. I conclude that plaintiff's due process claim is without foundation and that even if plaintiff's reassignment and his loss of the opportunity to provide firearms instruction amounted to a demotion, as he contends, or as a deprivation likely to deter free speech, defendant would be entitled to qualified immunity in his individual capacity. As the law stood in November 2006, defendant could not have known that he would be held liable for damages or injunctive relief if he demoted a Polk County deputy sheriff or changed his duties in response to the deputy's working for his defeat at the polls. Defendant is not liable to plaintiff in his official capacity because plaintiff is not alleging that the changes defendant made in plaintiff's job duties were made in conformance with a custom or policy of the county or shown that defendant was the final policy maker for employment matters in the Polk County Sheriff's Department. Defendant's motion for summary judgment will be granted.

Before discussing the facts of this case, I note that plaintiff proposes a handful of facts about an email his wife sent to some friends that was critical of defendant. It is undisputed that the email was political advocacy for defendant's opponent in the Democratic primary, but the facts about the email are not relevant to deciding the case. Plaintiff is suing for the alleged violation of his First Amendment rights of free speech. He has not alleged any issue of retaliation in the context of his wife's speech or argued any basis for the claim.

2

The Court of Appeals for the Seventh Circuit has not addressed retaliation in the context of a spouse's speech, but other courts have recognized such a claim as a violation of the right of intimate association.  E.g., Adler v. Pataki, 185 F.3d 35, 44 (2d Cir. 1999) ("[W]e think a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association."); Singleton v. Cecil, 133 F.3d 631, 635 (8th Cir. 1998) (affirming district court's decision to grant defendant's motion for summary judgment on plaintiff's claim that his termination as police officer on basis of wife's conduct did not violate his First Amendment right to intimate association), aff'd en banc in pertinent part, 176 F.3d 419, 423 (8th Cir. 1999); Toronyi v. Barrington Community Unit School District 220, No. 03-C-3949, 2005 WL 388568, at *6 n.7 (N.D. Ill. Feb. 10, 2005) ("To the extent that Mr. Toronyi alleges that his termination was motivated by his wife's free speech, he may be able to bring a First Amendment retaliation claim based on the right of intimate association.").  Plaintiff has not suggested that he is pursuing a claim for a violation of his right of intimate association.  Therefore, I will disregard any proposed facts relating to his wife's emails and other political expression.

From the parties' proposed findings of fact and the Polk County, Wisconsin Job Description, dkt. #17-3, I find that the following facts are material and undisputed.

3

UNDISPUTED FACTS

A.  <u>Parties</u>

Plaintiff Jared Cockroft was employed as a deputy sheriff in Polk County, Wisconsin, from 1998 to 2007.  During that time he served as a unified tactics instructor for firearms and vehicle contacts, a field training officer and a designated marksman with the Emergency Response Team.  Defendant Timothy Moore was hired by the Office of the Sheriff for Polk County in 1991 and had attained the rank of lieutenant as of December 2005, when the governor appointed him sheriff for Polk County to replace the previous sheriff.

B.  <u>Office of the Sheriff for Polk County</u>

The Polk County Sheriff's Department has 76 employees, 28 of whom are sworn law enforcement officers or deputies.  Sworn officers occupy one of four positions:  patrol deputy; patrol sergeant; investigator; and civil process.  It is left to the sheriff's discretion to determine the position to which a deputy is assigned.

> Of the 28 deputies, 17 are assigned to Patrol Units, with the following duties: Overall responsibilities of preventing, detecting and investigating crimes, apprehending criminals and other violators.  Responding to emergencies and all other calls for Law Enforcement services.  Keeping the peace, protecting persons and property and assisting the public.  Patrol deputies also assume primary responsibility for traffic enforcement, accident investigation, and assisting the judicial system in pursuing justice.  Documenting events and occurrences.

4

Polk County Job Description, dkt. #17-3, at 1.  Patrol deputies working a 6-days-on-3-days-off schedule work an 8.5-hour  day, or 2068 hours annually.  Patrol deputies working a 5-days-on-2-days-off schedule work Monday through Friday with all weekends off, or 2080 hours annually, and earn an extra 60 cents an hour.  Neither schedule guarantees more overtime than the other.  Overtime assignments are posted and filled on a first come, first served basis.  Deputies working the night shift have more overtime opportunities for court appearances and training because those activities generally occur during the day after their shift is completed.  Night shift deputies receive a minimum of four hours overtime for testifying in court.

Patrol deputies may be given one of a variety of assignments, including civil process server, recreational patrol officer, canine officer, investigation unit and school liaison officer. The school liaison officers serve as liaison between the Office of the Sheriff and the school systems to which they are assigned.  They work a 5-2 schedule.  The sheriff's department provides one school liaison officer to work with both the Unity and Frederic school districts. Usually the liaison's shift is a day shift, but the deputy may be required to work a later shift to cover after-school events, such as basketball and football games and wrestling meets.

C.  The 2006 Polk County Sheriff's Election

In the 2006 election, plaintiff supported Arling Olson, another deputy in the sheriff's

5

department, who was running against defendant in the September 2006 Democratic primary. After Olson lost in the primary, plaintiff supported Anthony Grimm, who was also a sheriff's deputy and who ran as a Republican. For Olson, plaintiff signed nomination papers, posted yard signs, passed out literature and buttons and wrote letters to the editors of local newspapers in support of their candidacy. For Grimm, plaintiff wrote letters of endorsement to the editors of several local newspapers. Defendant defeated Grimm in the November 2006 general election to remain sheriff.

### D. November 16, 2006 Sheriff's Department Meeting

Shortly after the election, on November 16, 2006, defendant met with all of the sheriff's deputies to announce his plans for the department. Defendant started by saying he had heard that at least six deputies were planning to resign if he was elected sheriff and he had prepared individual resignation letters for those deputies. Defendant singled out plaintiff, asking him to come up in front of everyone and sign a letter of resignation that defendant had drafted for him. Defendant said he had heard that plaintiff was the most vocal about resigning. Plaintiff responded that he had never said that he could not work for defendant and that he did not intend to resign.

After the speech, defendant issued assignments for the following year. Deputy Olson was assigned to civil process, deputy Peter Johnson to investigation, deputy Tamara Larsen

6

to recreational patrol and plaintiff to school liaison.  Neither deputy Olson or plaintiff had requested reassignment from their previous assignments as night shift patrol deputies or indicated interest in reassignment.  The school liaison position had been left vacant since May 2006 when the incumbent had resigned and no deputies had expressed interest in filling it.

The job of school liaison officer includes all duties for which patrol deputies are responsible and other duties as well.  For example, the school liaison officer is required to "[r]espond to calls for assistance that originates [sic] from a school environment," "[o]ffer assistance to local police departments in events and occurrences involving school districts," "[r]espond to crisis situations involving students in a school setting" and "[o]ffer recommendations to schools regarding safety issues and crime prevention."  Dkt. #17-3 at 3.

Defendant also announced his plans to select new firearms instructors and asked those interested in the position to apply.  Firearm instructors' duties entail spending one day a month at the firing range assisting other officers.  Being an instructor does not provide additional pay or benefits, but is performed instead of the deputy's normal assignment for the day.  However, if a training day falls on the instructor's off day, he can earn overtime. Until that point, plaintiff, deputy Grimm and deputy sergeant Stoffel had been the instructors.  Plaintiff and Grimm were state-certified instructors; Stoffel was not.  Deputy

7

Stoffel, who had not opposed defendant's re-election, maintained his position as an instructor after defendant sought new instructors, but plaintiff and Grimm were relieved of their duties as firearms instructors.   Grimm and plaintiff could have submitted new applications for the position, but never did so.

E.   Plaintiff's Response to the Changes in His Job Assignment

After the meeting, plaintiff spoke with Sergeant Brent Waak and expressed his distress at losing his position as a firearms instructor.   Plaintiff told defendant he could obtain the firearms instructor range books when he "pried them from [plaintiff's] cold dead hands."   Waak Dep., dkt. #42, at 25-26.   On November 28, 2006, plaintiff complained to the Polk County Human Resources Director about having been called forward to resign at the November 16 department meeting, his assignment to the school liaison position and his removal from firearm instructor duties.   The County Human Resources Department never followed up with plaintiff about his complaint.

After plaintiff was assigned as the school liaison officer but before he began working in the position in January 2007, he communicated with the previous officer about the position, saying that he would not have requested the position, but he viewed it as a new opportunity.   Plaintiff added that his wife was very excited about his new opportunity. Although plaintiff made these comments, he believed that the liaison's duties required little

8

more than security guard functions, involving no police work or other law enforcement-related work.  Plaintiff saw the job as little more than "baby-sitting."  Also, as liaison, plaintiff was no longer assigned his regular marked car with radar; instead, he was assigned a marked car without radar.  Plaintiff had to be in uniform when working.

When plaintiff began his liaison assignment, defendant scheduled his work hours.  Although plaintiff's start times were generally 8 or 9 a.m. during the first five weeks of his liaison assignment, there were times when he did not start until 2 p.m.  The changing schedule created some difficulties for plaintiff and his wife in coordinating consistent child care arrangements.

On March 12, 2007, within two months of starting his assignment as school liaison officer, plaintiff resigned from the Polk County Sheriff's Department to accept a police officer position with the City of St. Croix Falls, Wisconsin.  In his resignation letter he noted that he looked "forward to returning to uniformed patrol duty, and getting back on the road as a police officer."  Plf.'s PFOF #66.  Plaintiff resigned because he believed that defendant had removed him from law enforcement duties, assigned him a demeaning and unchallenging job that was beneath his capabilities and seniority level and eliminated his advancement prospects within the department.

DISPUTED FACTS

The parties dispute several facts, but only one is worth worth mentioning.  I struck plaintiff's proposed fact that defendant had "commented that the school liaison officer position is not viewed as 'real police' work" because defendant testified on this point only after plaintiff's attorney showed him a document from a previous grievance proceeding involving another officer that plaintiff had never provided to defendant or defendant's lawyer.  Under Fed. R. Civ. P. 26(a)(1)(A)(ii), "a party must, without awaiting a discovery request, provide to the other parties: . . . a copy . . . of all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment."

OPINION

A.  <u>Retaliation for Exercise of Free Speech</u>

"'To make out a prima facie case of first amendment retaliation, a public employee must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action.'" <u>Nagle v. Village of Calumet Park</u>, 554 F.3d 1106, 1123 (7th Cir. 2009) (quoting <u>Massey v. Johnson</u>, 457 F.3d 711, 716 (7th Cir. 2006)) (citations omitted). The parties agree that plaintiff's speech in support of the two deputies running against

10

defendant in the sheriff's election is constitutionally protected.  They dispute whether plaintiff suffered a deprivation that would be likely to deter free speech.

In identifying the kind of deprivation that would have the effect of deterring speech, the Court of Appeals for the Seventh Circuit has explained that

> Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable, even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday, Bart v. Telford, 677 F.2d 622, 624 (7th Cir. 1982), if (an important qualification, emphasized in Bart, at 625) the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty.

Power v. Summers, 226 F.3d 815, 820 (7th Cir. 2000).  In other words, "the action of which the employee is complaining must be sufficiently 'adverse' to deter the exercise of [free speech] rights."  Id. at 820-21.  This is an objective standard, viewed from the perspective of a person of "ordinary firmness." Pieczynski v. Duffy, 875 F.2d 1331, 1333 (7th Cir. 1989).  Further, to establish that the complained-of action was sufficiently or materially adverse, a plaintiff must show at least that he was "made worse off by [the action]." DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 191 (7th Cir. 1995); see also Owens v. Ragland, 313 F. Supp. 2d 939, 949 (W.D. Wis. 2004) (one use of word "disgruntlement" not sufficiently adverse).

Plaintiff's only claim is that his reassignment amounted to a demotion, but he has failed to prove that it was anything other than a lateral transfer.  E.g., Mills v. City of

11

Evansville, 452 F.3d 646, 647 (7th Cir. 2006) (finding that after plaintiff criticized departmental policy, she was laterally transferred, not demoted, when she was removed from supervisory duties, reassigned to patrol duties and lost use of department car but received a $1,200 pay increase because of shift change).  In dicta in Mills, the court said

> When the Supreme Court held in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Rutan v. Republican Party of Illinois, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), that the first amendment bars linking hiring, firing, and promotion decisions to the employee's politics, it did not doubt that a public employer retains a powerful interest in ensuring that all positions are filled by workers who will stand behind rather than subvert the decisions made by politically accountable actors. If a chief of police can't fire or demote sergeants whose views imply less than enthusiastic support, what can he do to ensure faithful implementation? The answer must be a lateral transfer; that's how Evansville proceeded with Mills.

Id. at 648.

It appears unlikely that plaintiff could show that a person of ordinary firmness would be deterred from engaging in election campaigning by the three deprivations he suffered.  It is undisputed that he maintains the same responsibilities (albeit at a new location), his pay has not declined and probably increased, with fewer hours worked, he works days only, he remains in uniform and he maintains his classification as patrol deputy.  Plaintiff's only reasons for characterizing his reassignment as a demotion is his personal preference for patrol duties over school liaison duties, driving a squad car with radar over one without and a night-shift schedule with rotating off-days as opposed to a day-shift schedule with no weekend

12

work.  His personal preference for one assignment over another would not allow a reasonable jury to find that the changes in his  primary duties caused his job to undergo "a dramatic downward shift in skill level" or that the change resulted in a significant diminution in responsibilities, which is what plaintiff would have to prove.  Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir. 1994) (reassignment of nearly all of plaintiff's job responsibilities, except most mundane) (citing Crady v. Liberty National Bank & Trust Co. of Indiana, 993 F.2d 132, 135 (7th Cir. 1993)), However, for the purpose of this motion only, I will assume that he could make this showing.

## B.  Qualified Immunity

Even if plaintiff could prove that the changes in his job were the kind of loss that would deter a person of ordinary firmness from taking political positions in elections and therefore a violation of plaintiff's First Amendment rights of free speech, the doctrine of qualified immunity shields defendant from liability.  "A governmental official is entitled to immunity from suit when performing discretionary functions unless the court determines that (1) the plaintiff alleged a constitutional injury and (2) the legal standards applicable to the injury were clearly established at the time."  Myers v. Hasara, 226 F.3d 821, 828 (7th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)).

As of November 16, 2006, no person in defendant's position would have known that

13

a sheriff of a small county could not discharge or demote deputies who had campaigned against him in a re-election campaign.  For a number of years, the court of appeals has viewed sheriff's deputies in small jurisdictions as "policy making employees" because they "operate with a sufficient level of autonomy and discretionary authority."  As policy making employees, they were not protected by the holdings in Elrod v. Burns, 427 U.S. 347, 373 (1976), and Rutan v. Republican  Party, 497 U.S. 62 (1990), that dismissal, demotion or promotion of non-policy making government employees on the basis of their political positions is unconstitutional under the First and Fourteenth Amendments.

In other words, if a sheriff wanted to terminate the deputies who had supported his opponent in the election, he could do so with impunity, at least as to their First Amendment claims. (Wis. Stat. § 164.015 provides that "no law enforcement officer may be prohibited from engaging in political activity when not on duty or not otherwise acting in an official capacity, or be denied the right to refrain from engaging in political activity." Fuerst v. Clarke, 454 F.3d 770, 773 (7th Cir. 2006).)  In Dimmig v. Wahl, 483 F.2d 86 (7th Cir. 1983), the court of appeals dismissed an action involving the discharge of a deputy who had remained neutral in the election and in Wilbur v. Mahan, 3 F.3d 214, 218 (7th Cir. 1993), it found no First Amendment violation in a rule requiring deputies to resign from the department if they wanted to run for election.  In Wallace v. Benware, 67 F. 3d 655, 661 (7th Cir. 1995), the court held that it would have been permissible for the Polk County

14

Sheriff to have dismissed or demoted a deputy who had supported the sheriff's opponent in the election on the ground that "once elected to public office, a sheriff should be entitled to place in the policymaking position of deputy sheriff loyal and trustworthy individuals who would be most effective in carrying out his electoral mandate."  What he could not do was undertake a campaign of petty harassment that included such things as taking the plaintiff off summer boat patrol duty, which he had performed for ten years, taking away his radio for communicating with the sheriff's dispatcher, taking away his radar unit, although he remained on regular patrol duty, refusing to allow him to order materials for the D.A.R.E. program he presented in the public schools, refusing to allow him to accept speaking invitations in the schools and sending other deputies in his place, refusing to speak to with him, requiring him and no other officer with patrol duties to leave his patrol car at the department over the weekend, assigning him to cleaning duties not in his job description and putting him at unnecessary risk in a hostage situation.  Id. at 657-59.

Because Wallace was limited to retaliation that took the form of a campaign of petty harassment and plaintiff does not allege that defendant subjected him to such a campaign, the case does not establish that defendant would have known in 2006 that he could not give plaintiff a lateral transfer (or even a demotion) without violating his First Amendment rights.

Recently, however, the court of appeals has indicated that it is taking a different view of the "policymaking status" of deputies, at least in large metropolitan police forces and

15

sheriff's offices. In <u>Fuerst</u>, 454 F.3d 770, a case arising out of Milwaukee County, the court suggested that it was backing away from the idea that deputies are policy makers simply because they exercise discretion and implement the policies of the sheriff.  As the court pointed out,

> Wis. Stat. § 164.015 provides that "no law enforcement officer may be prohibited from engaging in political activity when not on duty or not otherwise acting in an official capacity, or be denied the right to refrain from engaging in political activity."  The last clause, read in light of section 164.03, which forbids any "discriminat[ion] . . . by reason of the exercise of the rights under this chapter," including the right of political inactivity conferred by section 164.015, makes clear that sergeants are not expected to be political loyalists of the sheriff.

<u>Id</u> at 773.  Although <u>Fuerst</u> was decided in July 2006 and defendant reassigned plaintiff in November 2006, <u>Fuerst</u> did not clarify the law as it related to the discharge or demotion of deputy sheriffs in small counties such as Polk.  Rather, the court emphasized the number of deputies in Milwaukee County and the improbability that each of them occupied a policymaking position.  It is possible that <u>Fuerst</u> will lead to a reevaluation of the holding that deputy sheriffs are policy makers, even in small counties, but defendant was not required to consider the possibility that this may happen in the future.  He is held only to know of legal standards that are clearly established at the time he is acting.  <u>Myers</u>, 226 F.3d 828.

 As noted, plaintiff has never argued or alleged that he was the subject of a campaign

16

of petty harassment.  His focus has been on his removal from his job as a night-shift patrol officer and his contention that he was not a policy making employee.  He might be able to make the showing that he is not a policy maker, but his doing so would not change defendant's entitlement to qualified immunity for the actions he took in November 2006.

## C.  Official Capacity Immunity

Plaintiff has sued defendant in both his official and individual capacities.  To prove official liability, he must show that defendant acted in conformance with a county policy or custom when he reassigned plaintiff or that defendant was the final decision maker for the county in personal decisions.  Baxter v. Vigo County School Corp., 26 F.3d 728, 735 (7th Cir. 1994), superseded by statute on other grounds, Endres v. Indiana State Police, 334 F.3d 618, 626-27 (7th Cir. 2003).  Plaintiff has advised the court that he does not contend that defendant's actions conformed to a county policy or custom and he says nothing about defendant's status as final decision maker.  He relies on Wis. Stat. § 895.46, which requires counties to pay civil judgments and taxable costs on behalf of all incumbent sheriffs found liable for acts taken while acting within the scope of their office.  He adds that he sued defendant in his official capacity for the sole purpose of obtaining injunctive relief from him or the county in the form of reinstatement.

17

Defendant's qualified immunity protects him from having to go to trial, not just from damages.  If he is qualified immune as I have found he is, plaintiff cannot obtain any remedy from him.  As for the county, plaintiff has adduced no evidence from which a reasonable jury could find that it is liable for defendant's actions.

### D.  Due Process Violation

Plaintiff advances what seems to be an odd contention:  that defendant constructively demoted and discharged him without due process in violation of the Fourteenth Amendment.  "Constructive" discharge refers generally to workplace conditions that are so objectively unbearable that an employee is forced to resign.  It can also refer to a situation in which "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns."  Fischer v. Avanade, Inc., 519 F.3d 393, 409 (7th Cir. 2008).  Neither is a situation in which one would expect due process protections.  There is no triggering event that would implicate due process, such as an announcement to the employee that he will be fired.  (Plaintiff has not alleged that he had no opportunity for a hearing after he left or that he could not have appealed the changes in his schedule and responsibilities, if, as he contends, they amounted to a demotion.)

18

A closer look at plaintiff's arguments suggests that plaintiff is advancing two points: first, that he was deprived of a property interest in his job as a deputy sheriff and in his night-shift assignment; second, that defendant made his job so miserable that he was forced to resign or alternatively, made it so clear to plaintiff that termination was imminent that he had no choice but to resign.  I will treat them as two separate issues.

1. Due process claim

"Procedural due process claims require a two-step analysis.  The first step requires [a court] to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due."  Barrows v. Wiley, 478 F.3d 776, 780 (7th Cir. 2007) (internal quotations omitted).  Stated another way, "the plaintiff must have a protected property interest in that which he claims to have been denied without due process."  Id.  In support of his contention that he has a protected interest in both his job and his former assignment, plaintiff cites Wis. Stat. § 59.26(8)(b)(5m), which provides that

> No deputy may be suspended, demoted or discharged by the grievance committee under subd. 3. or 5., based on charges filed by the sheriff, undersheriff or a majority of the members of the civil service commission for the selection of deputies unless the committee determines whether there is just cause, as described in this subdivision, to sustain the charges.

Defendant does not deny that plaintiff possessed a state-law created property interest in his position as a deputy sheriff and in not being demoted from that position.  However, as

19

defendant points out, being demoted from a deputy sheriff position and being reassigned as a night patrol deputy are not synonymous.  Although the statute does not define demotion, plaintiff suggests no reason to interpret the language as prohibiting lateral transfers made without just cause or why it would be reasonable to interpret it in that manner.  If sheriffs are to carry out their statutory duties, they need to be able to assign officers as they see fit.

Plaintiff's lateral transfer did not invoke any due process rights.  For starters, it did not involve a pay cut.  "[A] job action that causes no pecuniary loss whatsoever does not implicate the Constitution.'"  Barrows, 478 F.3d at 780 (quoting Deen v. Darosa, 414 F.3d 731, 734 (7th Cir. 2005) (citations omitted)).  "[T]o recover for a deprivation of a property interest, [a plaintiff] must show some economic loss from the [state's] action, or at least an identifiable impact on his future income or economic benefits."  Id. (quoting Bordelon v. Chicago School Reform Bd. of Trustees, 233 F.3d 524, 530 (7th Cir. 2000)).  Plaintiff alleges that the reassignment resulted in an overall pay decrease because of a loss of "substantial" overtime opportunities, but he adduced no evidence that he had ever taken advantage of these "opportunities" in the past or that his total pay for overtime and night shift duties had exceeded what he would receive as school liaison officer.  Mere speculation is not enough to show that his pay declined.  In addition, plaintiff received weekends off and he retained the same title, uniform and authority.  As with his retaliation claim, plaintiff's evidence of deprivations boils down to a loss of preferred job duties and the reassignment's

20

effects on his job satisfaction, but "[p]urely dignitary and non-pecuniary interests, such as professional satisfaction, personal relationships, and reputation, do not constitute property," id., that would entail due process protections.

2. Constructive discharge claim

To prevail on a constructive discharge claim, plaintiff must show that his working condition had become unbearable.  Fischer, 519 F.3d at 408-09 ("Constructive discharge . . . is deemed to have occurred when 'the plaintiff . . . show[s] that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable.") (quoting EEOC v. University of Chicago Hospitals, 276 F.3d 326, 331 (7th Cir. 2002)).  This is a more demanding standard than the showing that a plaintiff must make to prevail on a claim of retaliation for his exercise of his free speech rights.  Id. at 409 (before finding constructive discharge, "we require the plaintiff to demonstrate a discriminatory work environment 'even more egregious than the high standard for hostile work environment") (quoting University of Chicago Hospitals, 276 F.3d at 331-32).  Because it is unlikely that plaintiff cannot meet the less demanding standard, it follows that he cannot meet the more demanding showing.

No reasonable jury could find that plaintiff's working conditions were unbearable.  However, as I have noted, constructive discharge can take two different forms.  Fischer, 519

21

F.3d at 409.   Plaintiff contends that defendant's drafting a letter of resignation for plaintiff and calling on him to sign it in front of his fellow employees, along with his reassignment, showed that "'the handwriting [was] on the wall and the axe was about to fall.'"  Id. (quoting University of Chicago Hospitals, 276 F.3d at 332 (internal quotation omitted)). In other words, an objective employee in his position would have known from these actions that his job and career at the Polk County Sheriff's Department were over.

Defendant did put plaintiff on the spot in front of the other deputies, by asking him whether he planned to resign, but neither that incident nor the changes in his job duties amounted to "handwriting on the wall."  It is a far cry from the conduct described by the court of appeals in University of Chicago Hospitals, 276 F.3d at 332 (finding "writing on wall" when employee had been warned of employer's intention to terminate her and told that mistake on her part was 'the last straw,' and she arrived at work after vacation only to find her desk packed up, boxes piled up, and her office being used for storage); see also Neal v. Honeywell, Inc., 191 F.3d 827, 830-31 (7th Cir. 1999) (plaintiff suffered drastic reduction in duties, was made to feel like traitor for her whistle blowing and could not be assured by her employers that she could be kept safe).

Plaintiff was never warned about being terminated or even disciplined in any way that indicated he would eventually be terminated on made-up charges.  Instead, after the one unpleasant resignation incident, he continued to serve as a night-shift patrol deputy until

22

January 15, 2007, when his new assignment as school liaison officer began. In that new assignment, he received an increase in base pay and weekends off and was not stripped of his previous responsibilities, although his location changed. E.g., Fischer, 519 F.3d at 411 (finding no constructive discharge where no reduction in duties in new position and employee maintained "the same title, salary, benefits, and primary responsibilities.").

The record contains no evidence from which a reasonable jury could conclude that the reassignment put plaintiff "on a dead-end path towards termination." Id. Plaintiff began his reassignment on January 15, 2007 and resigned from the sheriff's department less than two months later, on March 12, 2007. Plaintiff did not provide "ample time to test [his] hypothesis regarding the dead-end nature of [his] new [assignment.]" Id. No reasonable jury could find from this evidence that defendant's acts would have led a reasonable employee to expect imminent termination.

ORDER

IT IS ORDERED that:

1. Defendant Timothy Moore's motion for summary judgment, dkt. #14, is GRANTED;

2. The clerk of court is directed to enter judgment in favor of defendant DISMISSING plaintiff Jared Cockroft's First Amendment retaliation and due process claims

23

and close the case.

Entered this 27th day of July, 2009.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge